Good morning. May it please the Court. As this Court well knows, the body of law for qualified immunity, as it relates to excessive force, is, to say it politely, thorny, complicated. It's kept academics, courts, and lawyers busy. Fortunately, the subset of law we're dealing with here in this circuit is very clear and has been consistently and routinely applied. That subset being cases in which an officer shoots a person who possessed a firearm. This Court summarized its law recently in a case called Cole, in which it said an individual's mere possession of a firearm is not enough for an officer to have probable cause to believe that that individual poses an imminent threat of death or serious bodily injury. Here's the tale. The suspect must also point the firearm at another individual or take similar menacing action. I was excited, I must admit, when I saw this panel because Chief Judge Colleton has written two of the opinions that are of much import in the Eighth Circuit. And they, those cases, Liggins and Locke, help define the contours of the law. And really the cases fall into two camps based exactly on this test. You have the cases that I'm going to call the you or me cases. And those are cases where an officer is in a split second situation in which if they wait to figure out what's going on, they could be dead or someone around them could be. And this Court has consistently and routinely granted summary judgment when on the undisputed facts the officer faced that split second you or me decision. Liggins, for example, a young man running with a gun in his hand, swinging it, moving towards the officer at an acute angle. The officer knows he's a felon. He knows he's in possession of a stolen gun. The Court correctly noted stolen guns are used in more shootings than any other disproportionately. And if he waits, he might be dead. He shoots. The appropriate shoot, summary judgment is granted. Locke, also written by you, your Honor, in which a man is known to be drunk. He's screaming at someone near him face to face. They say nose to nose altercation. The officer witnesses this, believes him to be armed. He turns towards the officer. The officer says on the ground. He doesn't get on the ground. He walks towards the officer. And as he's walking towards the officer, the evidence is, you know, he says he stumbles. But what's clear and undisputed is he reaches towards his waist where there's a black object. And the officer makes a you or me decision. Qualified immunity correctly avoids second-guessing officers in tough situations. But this Court has also routinely and consistently held that if there is a moment to assess before firing, that the officer must take it. And if the officer doesn't, at a minimum, if there's any dispute about whether there was a menacing act or whether there was reason to believe this was a you or me situation or rather a take a beat and assess situation, then summary judgment is inappropriate. That doesn't mean the plaintiff wins. It means that we go back and let jurors do their Seventh Amendment work. Sometimes the plaintiff loses, and sometimes the plaintiff wins. This case falls squarely in the second camp. What would be the disputed fact? The disputed fact? Are you saying the jury gets to decide reasonableness under the Fourth Amendment? No, I'm suggesting, Your Honor, that, I'm sorry, what I was suggesting is that if there is taken in the light most favorable to Officer Green, who's here and present, sitting in the middle, if he was the victim, Officer Green was a police officer, too, and was shot, if the facts taken in the light most favorable to him would establish that this was, for lack of a better term, a bad shoot, that this was done without provocation, that there was no pointing of the gun or menacing action, then the case would go to trial. And if the jury were to believe our facts, we would win. Well, that's standard Rule 56. Yes, Your Honor. But qualified immunity alters that. Well, Your Honor, I think there was – Because it requires the district court to view the facts, including disputed facts, from the officer's perspective. You're absolutely right, Your Honor, although still in the light most favorable to the nonmoving party, but from the officer's seat. And if I could, in ten seconds, I think I can explain to you at least what we believe those facts are and why you cannot grant summary judgment in this case. And I'm sorry I don't mean to be theatrical, but this is a physical case, so I'm just going to show you what was happening based on our evidence. If I'm Officer Green, he was standing facing an officer named Officer Colson, who was about 15 to 20 feet away. The record isn't precise, but not much further than the pillar, and he is facing him. Officer Tanner, who's the defendant who fired, comes from something like a 90-degree angle. And here's what Officer Colson, who has no dog in this fight, and if anything, probably risks some harassment by testifying that this isn't an appropriate shoot. Here's what Officer Colson said. He said, again, he's there and I'm Milton Green, he said that Milton Green had taken three or four steps towards him, that he had the gun at the ground, that he made no movements that suggested that he would harm anyone, and that he was walking calmly. So under our set of facts, viewed from Officer Tanner's perspective, as you appropriately say Judge Loken, what we must assume at this point is that Tanner saw a man with a gun at the ground, walking away from him, calmly moving in this direction, and that what Colson says that's critical is he says, Tanner then fired at Green without warning. How long between when Tanner arrived on the scene to begin witnessing this to the shot? What does the record show? Yeah, the record doesn't give us an exact number of minutes, but we can infer some things. And I'll just tell you what we know. Tanner arrived on the scene with his partner, and they got out of their car, and it looks like from where they parked, they walked about 200 feet up a street. They saw that there were some officers present, and they saw that there were police on the scene. Right, I'm just curious, from the moment he encounters the plaintiff in this case? Oh, I'm sorry. Yeah. No time. Our evidence is that he shot instantly. He doesn't see what you just described, the walking away and the calmness and so forth. Well, under our facts... You stated a scenario, and then said, I'm doing this from the officer's perspective. But you're assuming he saw all that. What's the evidence on that? Yes, Your Honor. The evidence is that if he came from Tanner's eyes, if he's over there and he comes, at a minimum, what we have to take as true is he sees Green facing away with the gun down in some motion this way. He sees him focusing on another officer, walking toward him with a firearm in his hand, right? No, Your Honor. He testified, Tanner testified unequivocally that he was defending only himself, and he didn't know that anyone else was present. Well, but what facts did the reasonable officer analysis, should we feed into that? I mean, he was with, and we're not getting, I don't want to get into the perception issue, right? A reasonable officer who showed up at that point, you just said, would have seen this. And what he would have seen, as I understand it, is the plaintiff walking toward another officer with a gun in his hand. Are you saying he was screened from seeing Carl sitting by the car? Yes, Your Honor. What I'm saying are two things. One is that I think the law says we have to take the officer in his position, but what we do is we take what he says he saw. What we can't do is imagine what someone else would have seen in a different scenario. So what was that? And so what Tanner says is that he saw only Green, and that he didn't know anyone else was there. And there was a vehicle, if we're sort of acting it out, I mean, there was a vehicle here that Tanner says meant that he couldn't see that Carlson was over here, that it was obstructing his view. Now, before Tanner got there, there had been an incident with three people in this vehicle, correct? That's right. And those three people had fired shots at police officers, is that right? That's absolutely right. And that was known to Tanner. Tanner knew, although he did not see that happen, he knew he was arriving on a scene where there had been gunshots. Was it reasonable for Tanner to believe that Green was one of the people from the car? It is at least a dispute of fact whether that decision would be reasonable for a number of reasons. And what's the disputed fact? Well, first of all, we do have a factual record that would suggest that any officer who objectively assesses a situation would not have shot Green under the assumption he's a suspect. And let me just give you one example. Why is that? Why would it be clearly established that it's unreasonable for Tanner arriving on the scene, seeing a man with a gun in the area where the suspects had alighted, to believe that he was one of the suspects? Well, there's two things I want to say there just to address them. One is, if it is reasonable to assume that anyone you see with a gun is the suspect, whether or not they meet the description, whether or not they are behaving as a suspect would behave, I'm worried about the sort of Second Amendment right. I just want to posit here, Officer Green was standing in his own driveway. I mean, he was in the correct place for where the suspects would be, right? I mean, he was right outside the block from where the car was. He was in the neighborhood. No, they registered the car, looked through the car, found nothing in the car, saw that two suspects had been apprehended, and then he walked. Tanner moved with his partner over about a half a block or so towards where he encountered Green. And, Your Honor, even if we take that he believed it was the suspect, it is not the law in this circuit that if you come across a suspect who's not facing you and has his gun down and is moving in some direction away from you, that you may shoot first and ask questions later. Even if he'd been shooting at police officers? Yes, even if he had been shooting at police officers. What about Garner? Doesn't Garner say that if you have probable cause to believe that the person… I think what the case law says is that you have to believe there's an immediate threat, and then we have this tale which means there's a firearm at you or a menacing action. And so maybe it would help, Your Honor. That's if you just come upon a person about whom you have no prior knowledge. But if the person is a suspect in a violent crime, doesn't the analysis change? No, Your Honor. In each of these cases in this court, the officer was addressing someone that they had reason to believe was a violent person or that had a gun and a reason to shoot. I mean, in each of the cases. If we look at, for example, Banks v. Hawkins decided by this court. In that case, you know, the information the officer had is that there's a domestic dispute inside, that there's yelling and screaming, that someone is violent. And the officer comes through the door, and he shoots when he sees a person coming towards him that he believes to be armed and violent. And this court said, well, yeah, but you can't instinctively shoot before assessing. And there's at least a dispute of fact whether you perceived this as a threat or not, whether an objectively reasonable officer would perceive this as an imminent threat. And what I would return to, and I know I sound like a broken record, but I do want to emphasize this. Is that at a minimum, we know that Tanner saw Green from the side with the gun down. And if the law becomes that with the... Tanner testified to that? No, but that's our facts. That's our facts from Carlson and from his partner Bell. And even Tanner's own partner who was behind him says, you know, I don't remember, I didn't see the gun being raised. Maybe it's worth talking about what Tanner said. At summary judgment, we can't credit what he said. Then why are we talking about it? Because what he said was that he gave Green multiple warnings, that Officer Green disobeyed the warnings of an officer. And then Officer Green turned and raised his gun to shoot another police officer. Nobody else on the scene says that because it didn't happen. Officer Tanner was later fired for showing up to work drunk. Officer Green is a decorated officer who was two weeks from promotion with a spotless disciplinary history. And in this case, the qualified immunity has a boundary. It does not protect an incompetent officer who, without assessing the situation at all, shoots someone who could be any ordinary citizen. And so if I could quickly judge about Liggins, if the facts in Liggins had been the young man was running away from the officer or walking away from the officer and he had the gun carefully pointed down, even in the fact that he's a felon and he has a gun, the officer would be obligated to attempt to assess the situation before he uses deadly force. What if the guy in Liggins had just shot somebody in the apartment building and was running away? And he's running away and couldn't escape? Doesn't Garner say you can shoot then because he just committed a violent crime? If you had the inference that he is an imminent threat to someone else... No, no, I'm not saying that. Okay, no, I don't believe that you can shoot someone who poses no threat to anyone. I believe Garner rests on the premise that that person would because it's reasonable to assume they pose a threat. Here, what I can tell you is we don't have those facts. Milton Green didn't match the description of the suspects. Milton Green wasn't acting as a suspect. Milton Green had been identified by Officer Carlson and, in fact, was providing a description of the suspect, Officer Carlson, when he was shot. And I'm sorry, I've gone way over time. I'm happy to answer questions, but I do want to reserve a little time if I could. Thank you, Your Honor. You may. Thank you for your argument. Mr. Wheaton, we'll hear from you. May it please the Court. Andrew Wheaton on behalf of the appellees, Detective Tanner and the City of St. Louis. I want to begin by noting that Milton Green was exactly where Detective Tanner would have expected to come upon a suspect who had fled out of this stolen vehicle that crashed near the intersection close to Milton Green's home. It was a tragic circumstance that Milton Green happened to be exactly where the third suspect had just seconds prior been with a gun in the side yard of the house where Milton Green was at the time that he was shot. I think it is important, Your Honor, and as some questions were asked on this point, that Detective Tanner knew that the suspects that he was pursuing were willing to kill police officers and had demonstrated their intention to do so before they would be taken into custody. They had done so by repeatedly firing at the pursuing officers. Several police vehicles were shot during the pursuit that led to this crash and circumstance. And so there was every reason for Detective Tanner to believe in that tense, rapidly evolving circumstance that the suspect, or at least who he reasonably believed was the suspect, intended to shoot him before he would be taken into custody. In the minutes leading up to this, that's exactly what they had demonstrated. And the context here is important, Your Honors. The Supreme Court has repeatedly affirmed that specificity in context is particularly important in the Fourth Amendment context, that it should be taken into account by district judges in this Court in the qualified immunity analysis. So in this case, Your Honors, given this tragic circumstance where Detective Tanner came upon this person who did have a gun in his hand, mind you, had reason to believe that he posed a threat. Go over why you think it was reasonable for Tanner to think that Green was one of the people from the car. So the suspect from the car had bailed out. Two of them had gone through a gangway to the left of Milton Green's house. And there was a shootout between those two and two other pursuing officers in this area over here. Now that happened in the yard area around Milton Green's home, not granted over on this side. But the other suspect, the third suspect, was here over to the right. So a reasonable officer in this circumstance could presume that if suspects bail out of the car, they're going to come out in that area exactly where he encountered Mr. Green. Was there any description of the suspect known to Tanner? So three black males in the car. I know that some of the witness officers had identified them as black males. I'm uncertain, as I stand here now a couple years later, as to whether Detective Tanner had identified the suspect as black males. Did he know that two had been apprehended and there was only one left? No, I heard the counsel say that. I have no memory of that being in the record here. I'm not prepared to say no, Your Honor, that's not the case. But at least that was not my understanding. My understanding was that the gunfight that had gone on between these two other officers and the two suspects had basically shots were continuing to be fired as Tanner pulled up to the scene. At least the district court held that, okay, that was over by the time that Tanner got out of the car. But again, it had just occurred and Tanner knew that. So I'm sorry I don't have a perfect answer to your question, Judge, but I'd be happy to file a citation after the fact if I find a specific reference on that point. In any event, what I do want to address here, Your Honors, and which the district court relied on primarily, was the undisputed fact, according to Mr. Green's own testimony, that at the time that he was shot, he had his arm extended with a metallic police badge in it and he had fully extended his arm and he had pointed his arm and the metallic object in it directly at Detective Tanner. And that much is undisputed in this case. I thought Tanner said he didn't see the extended arm. So what are the facts in the light most favorable to Green, that he didn't see the extended arm? So Tanner did say that he saw an extended arm. Now there is this distinction between left arm versus right arm. Tanner claims that he saw the right arm pointing the gun at him. But the facts in the light most favorable to Green are that the right arm was down with the gun. As I understand it, do you disagree with that? So I do agree that the parties disagree over which arm came up, but it is our position on this appeal that that distinction is an immaterial one, because both parties agree, like in Malone versus Hinman, on the material fact, that there was an arm extended, that it did have a metallic object in it. Are you sure about that? Or are the facts in the light most favorable to Green that Tanner saw only the right arm down? That Tanner saw only the right arm down, no. With the gun, with the gun. Yeah, so that was Green's testimony, the right arm was down. But I don't think so, Judge, because, and as the district court pointed out, Detective Tanner did testify that Green raised both arms towards him in the moment just before he was shot. And I was curious, too, there was a question about what is the plaintiff's position about what happened here. I've never been able to really determine what is it that the jury is supposed to find happened that is disputed in this case that would defeat qualified immunity, because the plaintiff agrees that his arm went up. Now, he disagrees which one. I thought his position was the jury could find that I had my right arm down with the gun, and my left arm out with the badge, and that Tanner saw only the right arm down with the gun and shot. Oh, I don't. Isn't that his position, and why is that wrong? So, well, Judge, I think it's wrong because while Tanner did say that I couldn't see exactly what was in the left hand, Tanner's testimony was, which fits with and is consistent with Green's version of events, which is that a metallic object went up, and that much is undisputed. And I'll add on that point that Detective Tanner, both in his interview right after the fact with the force investigative unit, and when he deposed in this case, said, when I hit that object with my flashlight from a distance of about 50 feet, I saw this flash of what looked like a nickel-plated pistol. It turned out it was a Department Beretta, he says. Now, a Beretta is not nickel-plated. It's a dark, you know, weapon. So that, as we view it, is consistent with the undisputed material fact in this case, that the badge was raised and pointed directly at Tanner. It was a mistaken perception, yes, but a reasonable one under these tense, rapidly-involving circumstances. What other conclusion could a reasonable officer draw from Detective Tanner's perspective, coming across this tense scene, seeing an arm raise up with a metallic object in it, and in that split second, hitting it with a flashlight, seeing what looked like a nickel-plated pistol, he has a mistaken perception that that's a gun. And Tanner's testimony was that he had just seen this individual pick up a gun from the ground, albeit with his right hand, but at a bladed angle in the dark, where it would be difficult, of course, for him to distinguish exactly between the two. So we think, of course, Judge, that the trial court's finding that this was a mistaken perception, but a reasonable one, is the correct finding on this record, that Locke versus... It's the correct finding. It's on summary, Judge. Well, correct holding, I guess I should say, Judge, the correct holding that qualified immunity applies. My apologies. And that Locke versus City of Litchfield controls the qualified immunity analysis here. But it applies after trial, too. So the only thing a jury could do would be answer interrogatories on these fact disputes. Well, and I hear and understand what you're saying on that point, Judge, but of course we maintain that qualified immunity is immunity from suit. It's immunity from the burden of going to trial, which is why we're here. But sometimes it doesn't work, except sometimes a suit is required. That is a possibility, Judge, yes. And then the plaintiff doesn't get the jury to decide what Tanner saw or whether Tanner was reasonable. The jury gets to find disputed facts that have caused this not to be decided at summary judgment, and then the court makes the legal decision on qualified immunity. That's widely misunderstood. Yeah, no, and I hear the special interrogatory possibility, but it's not necessary in this case, in our view, because the fact that it might be asked of the jury is, well, did he raise his metallic police badge towards Tanner and point his arm directly at Tanner in the moment just before he was shot? And that's exactly what Milton Green says happened in this case. So there's really no dispute over that. And then the qualified immunity analysis which follows is, is that consistent with Tanner's perception of a nickel-plated badge that he, a nickel-plated pistol that he hit with his flashlight in a split second from a distance just after he'd seen Milton Green pick up a gun? It's totally consistent. You're saying that Green says that he pointed the badge at Tanner, not at Carlson? A hundred percent that's what he says, Your Honor. And, you know, a point that he says it in multiple places, but I'll direct the court to appendix pages 443 to 444, where plaintiff's counsel actually followed up with Mr. Green and his deposition and asked him to the effect of, is it correct that your arm was facing Tanner, that your badge was facing Tanner? Yes, that's correct, was Mr. Green's testimony on that point. So what other conclusion could a reasonable officer draw? Why would somebody in this circumstance point his arm and a metallic object in it directly at Tanner as he's approaching the scene? Well, I don't know. Maybe the jury would say this is all confused because Tanner says he didn't see the left arm. So we have inconsistent testimony. We've got another guy saying he was pointing the badge at Carlson. Carlson apparently says that, right? So maybe the jury would say he wasn't pointing the badge at Green. So it's interesting, a couple points on that. With respect to Carlson, Green did say that initially he was pointing his badge towards Carlson as he walked this direction, but then he says later that it was pointed at Tanner. And the only conclusion you can draw from that is that first it's towards Carlson and then he moves it to point towards Tanner, which is a movement that is threatening under these circumstances, especially where you hit it with a flashlight. So I guess that's what I'd say on that point and also harken back. You think because it's an admission by the plaintiff that it comes through as undisputed? Right. We're relieved of the burden at trial of, you know, that's an admission by the plaintiff. I think that under the applicable instructions we're relieved of any burden of showing that it was otherwise on our affirmative defense. Even if the defendant admits he didn't see the left arm? Well, now he didn't admit that. He said that both arms went up. He said he couldn't see what was in the left hand. But on the same page that the plaintiff cite for their proposition that he couldn't see the left arm, the very same page, the next question almost was both arms went up. That's what Tanner said. So I encourage the Court to read that full, you know, page. I think that that's a little bit misconstrued here by the other side. And the district court correctly noted that in its initial summary judgment order. It was very clear. It said, but Tanner said that both arms went up when the district court was conducting its analysis on this left versus right arm question. And so, of course, we think the district court got it right, correctly recognized the undisputed facts in taking everything into context and correctly applied qualified immunity in this case. So, of course, we have the alternative argument here, that notwithstanding the mistaken perception argument, under these circumstances, like in Liggins, and even more so because we have gunshots being fired at police officers in the seconds leading up to this, that even if, you know, there's a dispute over the raising of the badge, that under these tense, rapidly evolving circumstances, coming across somebody with a gun, who you have every reason to believe is a suspect, who had just been shooting at you and trying to kill you and other police officers, is nevertheless, it was not clearly established that you could not use deadly force under those circumstances. And so at the least, qualified immunity should apply to protect Detective Tanner from liability in this case. So we do preserve and make that argument in the alternative. We don't think that it's necessary for this court to reach it, given the mistaken perception argument that the district court correctly agreed with and applied here. So, my time's running short, Your Honors. I'm happy to answer any other questions that the panel might have. I'll just briefly say, you know, this has already been briefed, that the official immunity state law analysis follows in the same vein. Official immunity should be applied to the state law claims, and that absent a constitutional violation, and certainly absent any clearly established constitutional guideposts in this realm, there should be no municipal liability, and so the city was correctly granted summary judgment in this case. So, just in conclusion, Judge, it's our position that really the only thing that a reasonable officer could do under these circumstances is to make the decision in that split second that force had to be used, and to look with hindsight and say he should have done something different would be inconsistent with the established precedent from this court and the Supreme Court. So, we ask that the district court be affirmed. Thank you very much, Your Honors. All right. Thank you for your argument. Mr. Campbell will hear brief rebuttal. Yes, Your Honor. First, I would say that the dialogue you just had is exactly why this case isn't ripe for summary judgment. Those were disputes of fact. So, for example, the testimony of Tanner is, during this entire interaction, did you see what his left hand was doing? No. Okay. Were you able to see it at all? Nope. And then we heard an argument that he was confused by the left hand. Judge Loken has it right. The jury will decide the facts, and then the law will be applied. And if the jury determines that in this situation, the assumption that this was the suspect, and the decision to fire when the suspect was facing away, not running, and with the gun down, a court could then say, under the doctrines of constitutional law and qualified immunity, the plaintiff wins, or the jury might conclude that this was so tense that it was reasonable to assume it was a suspect, and that it was appropriate to fire. I'm sorry my time has run out, but in conclusion, Your Honor, if I could just conclude, I would ask you to do what the law would dictate here, which is to allow jurors to sort out what is a factual record mired in question, and then allow the law to apply. But to apply it now, when it is hotly disputed, risks losing a fundamental control on government agents, the reach of those forces, and takes an undecorated officer and leaves him without a remedy. Thank you. Very well. Thank you for your argument. Thank you to both counsel. The case is submitted, and the court will file a decision in due course. The court will be in recess.